AULT & WIBORG CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16655.   Promulgated January 25, 1928.

184

*B. G. Simpich, Esq.*, for the petitioner.
*Henry Ravenel, Esq.*, for the respondent.

OPINION.

TRUSSELL: The record of this action establishes the fact that during a period beginning in the year 1915 and ending December 31, 1916, the Ault & Wiborg Co. of Cincinnati constructed new factory buildings and installed therein equipment and machinery at a cost of $411,775.68 and that on December 31, 1916, this amount was charged off to profit and loss but that neither this amount, nor any part of it, was taken as a deduction from gross income. Subsequently, in the early part of the year 1918, this same figure of $411,775.68 was restored to the capital account of the company. We are of the opinion that the restoration to capital account of the full amount of $411,775.68 was properly and lawfully made. However, having made such restoration, it follows as a matter of course that in ascertaining invested capital for the year 1918 account must be taken of capital additions and subtractions to and from this capital account and the company's surplus must be adjusted by setting aside an addition to depreciation reserve computed upon this capital asset during the two years of 1916 and 1917 and for the purpose of this action the rates of depreciation allowed by the Commissioner upon this asset or its component parts, as the case may be, should be applied in ascertaining the amount to be added to the reserve for the years 1916 and 1917.

The second issue presented with respect to whether or not petitioner was during 1918 affiliated with the Ault & Wiborg London Co., is governed by section 240 of the Revenue Act of 1918, the pertinent portion of which reads as follows:

SEC. 240. (b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The men who owned or controlled substantially all of petitioner's stock owned or controlled 260 shares of the London Company's stock and directed and operated the business of the London Company, which was established for the purpose of marketing in England the petitioner's products. The facts establish that petitioner or its stockholders controlled the London Company's business as effectively as they controlled the business at Cincinnati. Bertrand Russell purchased 240 shares of the London Company's stock without any restrictions as to his ownership thereof, as to how he should vote it or dispose of it. When so desired he sold one share to H. A. Drummond, who looked after Russell's interests while he was in active army service.

It seems apparent from this record that the Ault & Wiborg London Co. was nothing more than a selling agency of the Ault & Wiborg

Co. of Cincinnati, and that its business was conducted simply as a unit of the Cincinnati Company's business. It appears, however, that in 1912 the ownership of 240 of the 500 shares of the London Company passed into the hands of a British subject who continued to own the same until 1920, when this stock was again reacquired by the Cincinnati interests. In the cases of *Watsontown Brick Co.*, 3 B. T. A. 85; *Sutherland Manufacturing Co.*, 3 B. T. A. 1224; and *Adaskin-Tilley Furniture Co.*, 6 B. T. A. 316, the Board has held that owing to the substantial minority interest affiliation could not be allowed. The rule laid down in these and other cases may be followed in the instant case.

The third issue presented relates to the Commissioner's refusal to include in petitioner's invested capital as of January 1, 1918, the balance of undrawn dividends credited to the stockholders' personal accounts. During its corporate existence up to and including the year 1918, the petitioner kept no regular surplus and undivided profits accounts. Each year dividends were declared at a rate which absorbed the year's profits and such dividends were credited to the stockholders' personal accounts. The personal accounts were controlled by the respective stockholders, who deposited therein sums of money received from sources outside the corporation and who made such withdrawals from time to time as were needed for personal expenses, such withdrawals being made without any relation to stock ownership. Petitioner paid interest at the rate of 6 per cent per annum on the monthly balances of the said personal accounts. Over the course of a number of years, the credits to these personal accounts amounted to a very large sum which was invested in petitioner's business. However, petitioner was practically a close corporation and the stockholders willingly used a good portion of the profits in expanding the business. The stockholders considered petitioner indebted to them in the amounts of their respective balances and the petitioner considered itself so indebted as evidenced by the resolution of April 4, 1918, for the issuance of stock upon the cancellation of petitioner's indebtedness to the stockholders. The president of petitioner corporation testified that the word " indebtedness " used in said resolution, meant the credit balances in the stockholders' personal accounts. In view of all the facts and the continuous practice of the several stockholders, the credit balances in the personal accounts must be taken to represent corporate earnings distributed and not surplus or undivided profits within the meaning of section 326 of the Revenue Act of 1918. See *Hood Manufacturing Co.*, 7 B. T. A. 202.

The last issue presented is with respect to petitioner's claim for special assessment under the relief provisions of sections 327 and 328 of the Revenue Act of 1918. Petitioner has shown that it has

developed secret processes and formulae, but it has not shown to what extent they produced petitioner's income except in one instance where a certain patent has produced over $1,000,000 profits in about 27 years. We have not been shown the relation of the profits from that patent to the year 1918. The credit balances of the personal accounts constituted borrowed capital for only about three months of the year 1918, and then the stock issued therefor was included in invested capital for 1918. L. A. Ault testified, "My recollection is that we owed borrowed money at something over two million dollars," as of January 1, 1918.

An examination of the figures of invested capital, net income, and tax liability, discloses that on the basis of the Commissioner's adjustment the consolidated net income was only a trifle more than 20 per cent of the invested capital; that the excess and war-profits taxes were approximately 35 per cent of the net income; and that the total liability for income and profits taxes was approximately 42 per cent of the adjusted net income. From a consideration of all the facts in the record we are of the opinion that these facts do not disclose any such abnormality of capital, net income, and tax liability as to bring the petitioner and its admitted subsidiaries within the provisions of section 327 of the Revenue Act of 1918.

The deficiency should be computed in accord with the foregoing findings of fact and opinion.

*Judgment will be entered on 15 days' notice, pursuant to Rule 50.*